UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

COMMUNITY INSURANCE COMPANY
D/B/A ANTHEM BLUE CROSS AND BLUE
SHIELD,

        Plaintiff,

        v.

HALOMD, LLC, ALLA LAROQUE,
EVOKES, LLC, MIDWEST NEUROLOGY,
LLC, ONE CARE MONITORING, LLC, and
VALUE MONITORING LLC,

        Defendants.

Case No:

COMPLAINT
DEMAND FOR JURY TRIAL

Plaintiff Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield ("Anthem") submits the following Complaint against HaloMD, LLC ("HaloMD") and Alla LaRoque (collectively, the "HaloMD Defendants"), and Evokes, LLC, Midwest Neurology, LLC, One Care Monitoring, LLC, and Value Monitoring, LLC (collectively, the "Provider Defendants," and together with the HaloMD Defendants, the "Defendants" and members of the "LaRoque Family Enterprise"):[1]

## INTRODUCTION

1.     Anthem brings this action against Defendants for engaging in a coordinated fraudulent scheme to steal tens of millions of dollars from Anthem, employer sponsors, and other Blue Cross Blue Shield companies by systematically flooding the federal No Surprises Act's

---

[1] As alleged in this Complaint, Defendants knowingly and intentionally acted in concert and conspired with others who are not currently named as Defendants; namely, Scott LaRoque and MPOWERHealth, as well as other persons and entities known and unknown, being persons employed by and associated with the LaRoque Family Enterprise, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs, including the wrongful acts of wire fraud alleged herein.

("NSA") independent dispute resolution ("IDR") process with thousands of disputes that they knew at the time of submission were ineligible.

2.      Defendants' coordinated scheme involves (1) using the interstate wires to knowingly submit false and fraudulent attestations of eligibility for services and disputes that they know are plainly ineligible for the IDR process, (2) strategically initiating massive volumes of IDR disputes simultaneously against Anthem, and (3) improperly inflating payment offers that far exceed what the Provider Defendants could have received from patients or health plans in a competitive market—and in many cases, multiples above the Provider Defendants' arbitrary and non-market based billed charges.

3.      To execute their scheme, Defendants use a web of interrelated companies directly or indirectly owned by Defendant Alla LaRoque and her husband, Scott LaRoque. Alla LaRoque is the founder and President of HaloMD, the platform that Defendants use to systematically flood the IDR process with knowingly ineligible and inflated disputes. The Provider Defendants—whose services form the basis of Defendants' ineligible disputes—are connected to MPOWERHealth; Defendant Alla LaRoque sits on MPOWERHealth's board, and her husband, Scott LaRoque, is MPOWERHealth's founder and CEO. Together, Defendants form and operate as an association-in-fact enterprise: the LaRoque Family Enterprise.

4.      Through the LaRoque Family Enterprise, Defendants have initiated thousands of ineligible disputes against Anthem. Since 2024, approximately *50%* of disputes on which Defendants received an IDR payment determination against Anthem were clearly ineligible for the process. Defendants illicitly secured more than *$25 million* in improper IDR awards from these ineligible disputes (approximately *$15 million* of which the Provider Defendants improperly recovered after fraudulently inflating their offers far above their billed charges). But the

fraud didn't stop at ineligible disputes. Even on the eligible IDR disputes, Defendants deliberately exploited the IDR system to extract millions of dollars from Anthem that far exceeded the Provider Defendants' billed charges, let alone the actual cost or market value of their services.

5.      Defendants are guilty of violating the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Ohio Corrupt Activity Act, OHIO REV. CODE § 2923.31 *et seq.*, as well as other federal and state laws. Anthem brings this lawsuit seeking damages, vacatur of improper IDR determinations, and to end Defendants' ongoing criminal enterprise.

## THE PARTIES

### I.    Plaintiff

6.      Plaintiff Anthem is an Ohio corporation with its principal place of business in Mason, Ohio. Anthem is authorized to issue group accident and health insurance policies pursuant to Sections 1751 and 3929.01(A) of the Ohio Revised Code.

### II.    HaloMD Defendants

7.      Defendant HaloMD is a Delaware limited liability company with a business address at 5080 Spectrum Drive, Suite 1100E, in Addison, Texas.

8.      Defendant Alla LaRoque is the founder and President of HaloMD. She is a resident of Texas.

### III.   Provider Defendants

9.      Defendant Evokes, LLC ("Evokes") is a Delaware limited liability company that provides intraoperative neuromonitoring ("IONM") services, including for Ohio residents. Evokes is located at 8118 Corporate Way, Suite 212, in Mason, Ohio.

10.　　Defendant Midwest Neurology, LLC ("Midwest Neurology") is an Ohio limited liability company that also provides IONM services, including for Ohio residents. Midwest Neurology is located at 4100 Horizons Drive, Suite 101, in Columbus, Ohio.

11.　　Defendant One Care Monitoring, LLC ("OCM") is a Delaware limited liability company that similarly provides IONM services, including for Ohio residents. Like HaloMD, OCM is located at 5080 Spectrum Drive, Suite 1100E, in Addison, Texas.

12.　　Defendant Value Monitoring, LLC ("Value Monitoring") is a Delaware limited liability company that, like the other Provider Defendants, provides IONM services, including for Ohio residents. Value Monitoring is located at 2915 W Bitters Road, Suite 201, in San Antonio, Texas.

## JURISDICTION AND VENUE

13.　　This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, which gives federal district courts jurisdiction over civil RICO actions. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, including the No Surprises Act, 42 U.S.C. § 300gg-111, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.　　Venue is proper in this District under 28 U.S.C. § 1391 because: (i) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in, and were directed toward, this District; (ii) Anthem is headquartered in this District and has suffered injury here; and (iii) one or more of the Defendants reside here.

## **BACKGROUND**

I.   **Anthem Administers Health Care Claims and IDR Proceedings for Members, Plan Sponsors, Government Programs, and BlueCard Plans.**

15.     Anthem offers a broad range of health care and related plans and services to its plan sponsors and its members who enroll in an Anthem plan, including fully insured and self-funded employee health benefit plans. Anthem processes tens of millions of health care claims annually and is responsible for ensuring that claims are paid accurately and in accordance with plan terms.

16.     First, Anthem issues and administers fully insured plans, where Anthem is the ultimate insurer of the loss, collects premiums, and is financially responsible for any benefits paid out under the plan terms or pursuant to law. Anthem sells fully insured plans either directly to consumers, such as through the federal Health Care Exchange, or to small or large employer groups who offer coverage to their employees but do not themselves insure the loss under the plan. Fully insured plans are typically subject to state insurance regulation, such as state laws prohibiting surprise billing and mandating payment amounts for certain out-of-network claims.

17.     Second, Anthem administers self-funded plans, typically offered by large employers to their employees. These employers self-insure the plan and are financially responsible for any payment of benefits or other losses. Because employers often lack infrastructure to provide health insurance to their consumers, these plans contract with Anthem to receive administrative services, such as provider network development, customer service, and claims pricing and adjudication. These plans often delegate authority to Anthem to administer the IDR process on behalf of the plans, and the plans typically (though not always) reimburse Anthem for any losses resulting from IDR. These plans are generally exempt from state insurance laws, including state surprise billing regulation, unless the plan chooses to opt into the state law. Instead, the plans are subject to ERISA.

18. Third, pursuant to the BlueCard program, Anthem acts as a "Host Plan" to other independent Blue Cross and/or Blue Shield "Home Plans" whose members obtain treatment from providers in Anthem's service area in Ohio. As a Host Plan, Anthem manages and participates in IDR proceedings that are initiated by providers in Ohio for Anthem plans whose members received treatment from the initiating Ohio provider.

19. While Anthem administers different types of health plans and claims, providers generally know what type of health care coverage the patient has. Providers require proof of insurance at the point of service to submit claims to the health plan, and the member's health insurance card identifies the nature of the member's coverage. Anthem will also issue an explanation of payment ("EOP") to the provider that may provide coverage information for the member, among other information.

## II. Before the NSA, Out-of-Network Physicians Exploited American Consumers with Surprise Medical Bills.

20. Health plans like Anthem contract with a network of health care providers, including hospitals and physicians, from whom their members may obtain "in-network" care. Generally, patients receive better and more affordable health care coverage when receiving treatment from these "in-network" providers, since they have a contract with their health plan that governs the rate for the relevant services and that prohibits them from billing patients above that amount. Patients can choose to obtain treatment from out-of-network providers, which have no contract with their health plan, but typically, the care from out-of-network providers is more expensive.

21. In some situations—such as in case of a medical emergency, when the patient is seeking treatment at an in-network hospital, or utilizing air ambulance transports—patients have limited ability to select an in-network provider. Before the passage of the NSA in 2022, certain

out-of-network providers like the Provider Defendants—especially IONM providers, emergency medicine providers, air-ambulance providers, critical care providers, pathology providers, and radiology providers—capitalized on patients' lack of meaningful choice in these situations.

22.     Prior to the enactment of the NSA, these types of out-of-network providers widely engaged in the aggressive and financially devastating practice of "surprise billing." Specifically, the providers would exploit patients' lack of choice in selecting an in-network provider and bill the patient for the difference between their "inflated," "non-market-based rates"—known as "billed charges"—and the amounts paid by health plans. H.R. Rep. No. 116-615 (2020), at 53, 57.

23.     Surprise billing was particularly rampant among IONM providers like the Provider Defendants. Surprise billing providers like the Provider Defendants held "substantial market power" and "face[d] highly inelastic demands for their services because patients lack the ability to meaningfully choose or refuse care." Thus, surprise billing providers like the Provider Defendants could "charge amounts for their services that … result[ ] in compensation far above what is needed to sustain their practice." *Id.* at 53. Because surprise billing providers like the Provider Defendants could reap massive profits by issuing surprise medical bills to patients, they had little incentive to contract with health plans like Anthem and offer more affordable health care services to American consumers.

24.     Congress labeled this a "market failure" that was having "devastating financial impacts on Americans and their ability to afford needed health care." *Id.* at 52. In an attempt to resolve these problems, Congress enacted the NSA.

## III.     The No Surprises Act Curbed Abusive Surprise Billing Practices.

25.     Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services; (2) non-emergency services at in-network facilities;

and (3) air-ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. To be subject to the NSA and IDR, health care services must fall into one of these three categories and meet other statutory and regulatory requirements described below.

26. When enacting the NSA, Congress also found "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, at 55. Thus, the NSA created a separate framework outside the judicial process for health plans and providers to resolve specific types of eligible surprise billing disputes. *See* 42 U.S.C. § 300gg-111(c). The framework consists of (1) open negotiations—a required 30-business-day period to try resolving the dispute informally; (2) an IDR process for "qualified IDR items and services" if no agreement is reached; and (3) if applicable, a binding payment determination from private parties called certified IDR entities ("IDREs").

27. As a prerequisite for participating in the IDR process, the initiating party must first initiate and participate in "open negotiations" with the health plan. 42 U.S.C. § 300gg-111(c)(1)(B).

28. When a health plan receives a claim for out-of-network services subject to the NSA (*i.e.*, emergency services, services provided at an in-network facility, or air ambulance services), the health plan will make an initial payment or issue a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). The health plan's EOP includes, among other information, a phone number and email address for providers to seek further information or initiate open negotiations. *See* 45 C.F.R. § 149.140(d)(2).

29. If the provider is dissatisfied with the initial payment, then the provider or its designee may initiate open negotiations with the health plan by providing formal written notice to

the health plan within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A). After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over the 30-business-day open negotiations period. *See id.*

30.     If the provider initiates and exhausts the 30-day open negotiations period, and "the open negotiations … do not result in a determination of an amount of payment for [the] item or service," then the provider may initiate the IDR process. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i). The IDR process is only available to providers who first initiate and exhaust open negotiations with the health plan. *See id.* Providers must initiate the IDR process within four business days after the open negotiations period has been exhausted. *See id.*

31.     The IDR process is also only available for a "qualified IDR item or service" eligible for the process. 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(1), (b)(2). To be considered a qualified IDR item or service within the scope of the IDR process, the following conditions must be met:

a.    The underlying services are within the NSA's scope, meaning they are out-of-network emergency services, non-emergency services at participating facilities, or air ambulance services, and also of a coverage type subject to the NSA (*e.g.*, not government programs like Medicare or Medicaid);

b.    A state surprise billing law (referred to as a "specified state law" in the NSA) does not apply to the dispute;

c.    The underlying services were covered by the patient's health benefit plan (*i.e.*, payment was not denied);

d.    The patient did not waive the NSA's balance billing protections;

e.    The provider initiated and exhausted open negotiations;

f.    The provider initiated the IDR process within 4 business days after the open negotiations period was exhausted; and

      g.  The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

32.     Relevant to state surprise billing laws, which impact eligibility for IDR, the NSA defines a specified state law as "a State law that provides for a method for determining the total amount payable under such a plan, coverage, or issuer, respectively … in the case of a participant, beneficiary, or enrollee covered under such plan or coverage and receiving such item or service from such a nonparticipating provider or nonparticipating emergency facility." 42 U.S.C. § 300gg-111(a)(3)(I); 45 C.F.R. § 149.30 (same).

33.     The Centers for Medicare & Medicaid Services ("CMS"), the federal agency within the Department of Health and Human Services ("HHS") that is primarily charged with implementing the IDR process, has issued several resources to aid interested parties in determining whether a state surprise billing law exists. *See*, *e.g.*, CAA Enforcement Letters, available at https://www.cms.gov/marketplace/about/oversight/other-insurance-protections/consolidated-appropriations-act-2021-caa; Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process (Jan. 13, 2023), available at https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf.

34.     Ohio has a specified state law called the Ohio Surprise Billing Law, codified at OHIO REV. CODE ("ORC") § 3902.51, *et seq*.; *see* Ohio CAA Enforcement Letter (Feb. 17, 2021), available at https://www.cms.gov/files/document/caa-enforcement-letters-ohio.pdf. For out-of-network emergency services and unanticipated out-of-network care at in-network facilities, in the event a payor and provider cannot agree on a different amount through negotiations, this law requires payment at the greatest of: (1) the amount negotiated with in-network providers, facilities, emergency facilities, or ambulances for the service in question in that geographic region under that

health benefit plan, excluding any in-network cost sharing imposed under the health benefit plan; (2) the amount for the service calculated using the same method the health benefit plan generally uses to determine payments for out-of-network health care services, such as the usual, customary, and reasonable amount, excluding any in-network cost sharing imposed under the health benefit plan; or (3) the amount that would be paid under the Medicare program, part A or part B of Title XVIII of the Social Security Act, 42 U.S.C. 1395, as amended, for the service in question, excluding any in-network cost sharing imposed under the health benefit plan. *See* ORC §§ 3902.51(A)(1)(a)–(c), 3902.51(B)(1)(a)–(c). Ohio also provides for its own dispute resolution mechanism if the provider is dissatisfied with payment. *See* ORC § 3902.52.

35.     Finally, the NSA imposes certain other requirements for services submitted to IDR in addition to the fact they are qualified IDR items or services. For example, when a party submits multiple separate services to different patients in a single dispute, they must comply with the NSA's "batching rules." These require that the services be rendered to members of the same insurer or self-funded health plan during a 30-business-day period by the same provider and for treatment of the same or similar medical condition. *See* 42 U.S.C. § 300gg-111(c)(3)(A). Further, parties are prohibited from initiating IDR disputes involving the same parties and items or services during a 90-day period following an IDR determination, also known as the "cooling off period." *See id*. at § 300gg-111(c)(5)(E)(ii).

36.     When initiating the IDR process, providers must, among other things, submit an attestation that the items and services in dispute are qualified IDR items or services within the scope of the IDR process. *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* Notice of IDR Initiation Form, U.S. Dep't of Labor, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf. A copy of the IDR

initiation form, including the attestation, is provided to the non-initiating party, the IDRE, and the Departments.[2]

## IV.    The IDR Initiation Process Notifies Parties of Facts That Render Disputes Ineligible.

37.    Parties must initiate the IDR process online through a federal "IDR Portal." The website for submissions is https://nsa-idr.cms.gov/paymentdisputes/s/.

38.    The online process for initiating IDR is designed to notify initiating parties of facts that render services and disputes ineligible and prevent parties from inadvertently submitting ineligible items or services.

39.    The first page of the website specifies that parties may "[u]se this form if you participated in an open negotiation period that has expired without agreement for an out-of-network total payment amount for the qualified IDR item or service."

> Use this form if you participated in an open negotiation period that has expired without an agreement for an out-of-network total payment amount for the qualified IDR item or service.
>
> You can start the Federal Independent Dispute Resolution (IDR) process within 4 business days after the end of the 30-business-day open negotiation period if a determination of the total payment for the qualified IDR item(s) or service(s), including cost-sharing, wasn't reached.
>
> You will need to **provide information for both parties involved** in the dispute.

40.    The first page also provides a link to a list of states with specified state laws that may render the dispute ineligible for the IDR process:

> Review the IDR State list to determine which states will have processes that apply to payment determinations for the items, services, and parties involved. FEHB plans are subject to the Federal IDR process unless OPM contracts with FEHB carriers to include terms that adopt state law as governing for this purpose.

41.    Before initiating the IDR process, parties must agree to certain terms and conditions. The terms and conditions include a notice that the initiating party must submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process."

---

[2] The "Departments" include HHS, the Department of Labor, and the Department of the Treasury.

**Before starting:**

You may need to provide information by uploading separate documents. The total file size limit for all uploaded documents is 500MB. Be sure your files meet this limitation.

Along with the general information you'll need to start your Federal IDR dispute process, provide:

- Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
- Dates and location of qualified IDR items or services
- Type of qualified IDR items or services such as emergency services and post-stabilization services
- Codes for corresponding service and place-of-service
- Attestation that qualified IDR items or services are within the scope of the Federal IDR process
- Your preferred certified IDR entity

42.     After agreeing to the terms and conditions, initiating parties must answer certain "Qualification Questions" through an online form. If the answers to the Qualifications Questions indicate that the dispute is not eligible for IDR, the form will provide an alert and not allow the submission to proceed.

43.     For example, one of the key Qualification Questions on the federal IDR website asks when the party began the open negotiation process. That question as it appears on the website is below.



44.     Parties must exhaust a 30-business-day open negotiation period before either party may initiate the federal IDR process. If the initiating party enters a date that is not at least 31 days before the date of website submission, the federal IDR website will not permit the initiating party to proceed and seek payment for the service.

45.     The initiating party must also upload proof of open negotiation. To push an ineligible dispute past this step, the initiating party must upload a fictitious document to support a fabricated open negotiation start date.



46.     Further, if the IDR initiation is not within four business days of the end of the 30-day open negotiation period, the initiating party must provide a reason why they are eligible for an extension and provide supporting documentation.

47.     After successfully completing the Qualification Questions, the initiating party is asked to complete the Notice of IDR Initiation. The initiating party must provide a variety of relevant information, including the name and contact information of the health care provider, the claim number, the date of the service, the Qualified Payment Amount ("QPA")—generally their median in-network rate for the same service in the same geographic area—for the qualified IDR item or services at issue, and documentation supporting these facts.

48.     At the end of this process, the submitting party must attest, via electronic signature, that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process."



49.     A copy of the Notice of IDR Initiation—including the initiating party's attestation that that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process"—is provided to the non-initiating party (*i.e.*, the health plan), the IDRE, and the Departments.

50.     As illustrated above, at every stage of this online process, the initiating party must make false statements to submit a dispute for services that are not eligible for IDR, or the process cannot continue. As such, when a party initiates the IDR process, it has full knowledge of the requirements and limits of the IDR process.

51.     HHS administers the IDR initiation process. Any submission made through this system is a statement made to the federal government, and any attestation made as part of the submission process is also made to the federal government. False attestations to the federal government violate 18 U.S.C. § 1001.

## V.     Anthem Also Informs Providers of Ineligible Disputes, including Those Subject to Ohio's Surprise Billing Law.

52.     In addition to the Qualifications Questions and IDR initiation process, Anthem sends multiple communications informing providers when services are ineligible for the IDR process.

53.     For example, Anthem's EOPs use the code "AVS" to inform providers that a claim's items and services are subject to the Ohio Surprise Billing Law and therefore ineligible for the federal IDR process. The description of the AVS code states, among other things, that "*[t]his was adjusted to follow Ohio balance billing laws and rules*," and "*[p]ayment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code*."

| AVS | This was adjusted to follow Ohio balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network. Payment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member can only be billed their copay, deductible or percentage of the cost for this care. |
| --- | --- |

54.     When providers initiate negotiations for items and services subject to the Ohio Surprise Billing Law, Anthem notifies the provider that the "reimbursement amount *is calculated pursuant to ORC section 3902.51 (B)(1) of the Ohio Surprise Billing Law*."

> We received your negotiation request on 1/23/2025 , for the below-referenced claim(s) for out-of-network services rendered to the listed member(s) with a plan that is insured or administered by Anthem.A final determination has been made on the claim(s) associated with your negotiation request. We are unable to offer you any additional payment on this claim. The claim(s) reimbursement amount is calculated pursuant to ORC section 3902.51 (B)(1) of the Ohio Surprise Billing Law. The payment listed in the "Payment made to date" column below is the maximum amount that we will pay for the billed service(s).

55. And even when providers ignore Anthem's EOP and negotiations communications for items and services subject to Ohio's Surprise Billing Law, Anthem informs the provider or designee that the items or services are "***ineligible for IDR under the NSA because a state surprise billing law applies***."

> The Independent Dispute Resolution (IDR) Team has received an IDR initiation notice for the above DISP Number. After review, the claim(s) is/are out of the scope (OOS) of the Federal No Surprises Act (NSA), due to the following reason(s). Please refer to the addendum for more information.
>
> ☑ The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies. Per CMS guidelines, where a specified state law provides a method for determining the total amount payable for out-of-network items and services, providers may not engage in the federal IDR process for resolving payment disputes under the NSA.

56. Like the Qualifications Questions and IDR initiation process, Anthem's communications of ineligibility in the EOP, during open negotiations, and after IDR initiation ensure that providers do not mistakenly initiate the IDR process for non-qualified items or services that are outside the scope of the process.

## VI. If Applicable, IDREs Make Binding Payment Determinations with Limited Judicial Review

57. After the provider initiates the IDR process, the parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F). The IDRE performs two tasks.

58. *First*, the IDRE is required by regulation to "determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). In making the determination that the IDR process applies, the IDRE is directed to "review the information submitted in the notice of IDR initiation" with the provider's attestation of eligibility. 45 C.F.R. § 149.510(c)(1)(v). In practice, this is a cursory review by the IDRE based on incomplete information and rife with errors due to the systemic overwhelm from the high volume of disputes.

59.     *Second*, if the IDRE determines the IDR process applies, then the IDRE proceeds to a payment determination. 42 U.S.C. § 300gg-111(c)(5)(A).

60.     IDR payment determinations resemble a baseball-style arbitration where the provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B).

61.     In making its determination, the IDRE must consider the QPA—typically the health plan's median in-network contracting rate for the services—and several "additional circumstances," such as training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). IDREs cannot consider, among other things, the provider's charges. 42 U.S.C. § 300gg-111(c)(5)(D) (IDREs "shall not consider … the amount that would have been billed by such provider or facility …"). Congress reasoned that permitting IDREs to "consider non-market-based rates such as the providers' billed charges … may drive up consumer costs." H.R. Rep. No. 116-615, at 57.

62.     The NSA provides that IDR determinations are "binding" unless there was "a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim[.]" 42 U.S.C. § 300gg-111(c)(5)(E)(i).

63.     Parties to IDR proceedings are responsible for payment of two fees. First, both parties must pay a non-refundable administrative fee of $115 when the dispute is initiated (previously a $50 fee). This is typically not recoverable even when the IDRE determines that the dispute is not qualified for IDR, or even when the initiating party later voluntarily withdraws the dispute. Second, both parties must pay an IDRE fee before the IDRE makes the payment determination. The IDRE fee is set by the specific IDRE and depends on the type of IDR submitted, but ranges from $200 to $1,173. The party whose offer is selected by the IDRE is refunded its

IDRE fee, meaning it is only responsible for the $115 administrative fee. The non-prevailing party is responsible for both the administrative fee and the IDRE fee.

64.    Notably, IDREs are only compensated when a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F). They do not receive compensation when dismissing a dispute due to the ineligibility of the service. *See id.* And because IDREs are compensated on a per-dispute basis, they receive greater compensation when there are a greater total number of disputes.

65.    The NSA permits judicial review "in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9" of the Federal Arbitration Act ("FAA"). 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). This includes the following:

a.  where the award was procured by corruption, fraud, or undue means;

b.  where there was evident partiality or corruption in the arbitrators, or either of them;

c.  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

d.  where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).

## DEFENDANTS' FRAUDULENT BILLING SCHEME

66.    With the passage of the NSA, surprise billing providers could no longer exploit American consumers through surprise medical bills. But as detailed further below, through shared ownership and control of HaloMD, an IDR administrator, and surprise billing providers like the Provider Defendants, Defendants found a new target to exploit for massive profits: the NSA's IDR process, and by extension, health plans like Anthem.

67.     Beginning no later than January 2024, Defendants commenced a coordinated scheme to exploit the IDR process and fraudulently submit thousands of ineligible and inflated disputes to Anthem, misrepresenting their eligibility for IDR under the NSA. These disputes were not merely erroneous; they were fraudulent.

68.     The core of the criminal enterprise was a lie: that the submitted disputes met the criteria for the federal IDR process. But they did not. Approximately *50%* of the disputes submitted by Defendants—comprising thousands of disputes—were categorically ineligible for the IDR process. As a result of these ineligible disputes, Defendants have fraudulently secured improper IDR payments totaling more than *$25 million*.

69.     As explained above, IDR is only available for specific categories of disputes, subject to strict statutory and regulatory criteria. However, Defendants submit false attestations through the IDR portal claiming eligibility for disputes involving: (1) state-law governed services preempting federal IDR; (2) services denied or not covered by the patient's plan; (3) disputes for which Defendants failed to initiate or pursue open negotiations; and (4) disputes already resolved or barred by timing rules.

70.     How have the Defendants pulled off this brazen fraud scheme? By exploiting the scale and automation of Artificial Intelligence. Promoting their use of AI in IDR submissions, the HaloMD Defendants, on behalf of and in coordination with the Provider Defendants, have flooded the IDR system with disputes at an industrial scale, deliberately overwhelming IDR safeguards and enabling payment on their fraudulent disputes.

71.     Defendants' continuous and ongoing scheme to exploit the IDR process involves three related tactics. *First*, using interstate wires, Defendants make repeated false representations and attestations of eligibility to Anthem, the IDREs, and the Departments. *Second*, Defendants

strategically submit massive numbers of open negotiations and IDR initiations—most of which are ineligible for IDR—in an attempt to overwhelm the ability of health plans like Anthem to contest claims, confuse and swamp IDREs, and manipulate the IDR process. ***Third***, Defendants capitalize on flaws in the IDR process by submitting outrageous payment offers that they could never receive on the open market, including many that exceed the Provider Defendants' billed amounts. *See* H.R. Rep. No. 116-615, at 53, 57 (noting that billed amounts should not be used in the IDR process, because billed amounts are "inflated," arbitrary, and "non-market-based" charges).

72.     Through this step-by-step campaign of deception, Defendants turned the NSA's IDR process into a profit-generating fraud machine. Their scheme was not only foreseeable—it was deliberate.

73.     This multi-step process is depicted visually in the diagram below:



I.      **Defendants Knowingly Make False Attestations of Eligibility to Initiate the IDR Process**

74.     When initiating ineligible disputes against Anthem through the IDR process, Defendants make repeated false attestations and representations that the items or services in dispute are "qualified item(s) and/or service(s) within the scope of the Federal IDR process." 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* Notice of IDR Initiation Form, U.S. DEP'T OF LABOR, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf. Defendants make these false attestations and representations to Anthem, the IDRE, and the Departments.

75.     The items and services that Defendants falsely attest are "qualified item(s) and service(s) within the scope of the Federal IDR process" are clearly ineligible, and Defendants know that they are ineligible when making their false attestations.

76.     As noted above, the online process for initiating IDR is designed to notify initiating parties of facts that render services and disputes ineligible and prevent parties from inadvertently submitting ineligible items or services. Initiating parties must identify, among other things, the specific date that they initiated open negotiations, the type of health plan coverage for the patient who received the services, and an affirmative attestation that the "item(s) and service(s) at issue are qualified items and/or service(s) within the scope of the Federal IDR process." Thus, *at every stage of the initiation process*, Defendants must make *affirmative false statements* to proceed with the dispute or the process cannot continue for these plainly ineligible services.

77.     In addition, Anthem often directly notifies the HaloMD Defendants and the Provider Defendants that the items or services at issue in their IDR initiation are ineligible. These notifications put both sets of Defendants on clear notice that their submissions violate the NSA's eligibility requirements. Yet, despite receiving this information, the Defendants routinely proceed

with their IDR demands anyway—demonstrating not only their knowledge of the fraud, but their intentional and ongoing participation in it. This further underscores the knowing, coordinated nature of their scheme.

78.     For example, Defendants routinely initiate the IDR process despite failing to initiate or pursue open negotiations. Open negotiation is a prerequisite to IDR; providers must attempt to negotiate a resolution with health plans before initiating the IDR process. Yet from 2024 to present, the Defendants submitted hundreds of disputes for services *where no open negotiation occurred* and/or where the IDR initiation was not within four days of the 30-day open negotiation period.

79.     Defendants cannot initiate the IDR process by mistake with no open negotiation. As noted, the federal IDR portal's Qualifications Questions require Defendants to (1) identify the date on which they initiated open negotiations, and (2) upload documentation of open negotiations. But Defendants deliberately fabricate this step, by selecting an arbitrary, false start date for the open negotiation period and/or by generating a fictitious justification for an extension. Defendants' electronic submissions for each of these disputes was an instance of wire fraud; Defendants had to put in a fabricated date in order to get their disputes submitted and/or overcome the IDR system's safeguards or generate a fictitious justification for an extension. As a result of these disputes alone, the Defendants recovered tens of millions in improper IDR awards.

80.     As another example, Defendants initiated hundreds of IDR disputes that were subject to the Ohio Surprise Billing Law and therefore ineligible. Defendants knew that these disputes were ineligible; Anthem's EOPs, responses to negotiations, and objections to eligibility after IDR initiation informed Defendants that the items and services were subject to the Ohio Surprise Billing Law and therefore ineligible for the federal IDR process. Moreover, the first page of the IDR initiation process provides a link to states that have surprise billing laws, and the CMS

also publishes charts and other resources to inform providers of the states with surprise billing laws and the scope and applicability of those laws. *See* Notice of IDR Initiation, HHS, available at https://nsa-idr.cms.gov/paymentdisputes/s/; *see also, e.g.*, CAA Enforcement Letters, CMS, *supra*; Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process, CMS, *supra*.

81.     Typically, the HaloMD Defendants—the enforcement arm of this fraud strategy— make these false attestations of eligibility when initiating the IDR process on behalf of the Provider Defendants. But the Provider Defendants know full well that the services at issue are ineligible and that HaloMD's attestations are false. As described below, the relationship between Defendants is so deeply entangled that the Provider Defendants are, for all practical purposes, making the false attestations themselves. Their coordination is deliberate, sustained, and central to the fraudulent scheme.

## II.     Defendants Strategically Initiate a Massive Volume of IDR Disputes Simultaneously.

82.     To push thousands of ineligible disputes against Anthem through the IDR process with their false attestations of eligibility, Defendants also initiate a massive number of IDR disputes all at once to overwhelm the IDR system. This abuse of volume is not incidental; it is strategic to secure favorable or default outcomes when health plans and IDREs cannot keep up.

83.     Overall, the NSA's IDR process has been overwhelmed by a staggering volume of disputes that far exceed the government's initial estimates. Before the IDR process launched, CMS estimated that parties would initiate about 22,000 IDR process disputes in the first year. *See* 86 Fed. Reg. 55,980, 56,068, 56,070 (Oct. 7, 2021).

84.     The reality has shattered those estimates. The most recent government statistics show that in the second half of 2024, disputing parties—virtually all of whom are providers—

initiated **853,374 disputes**, 40% more than the first half of 2024 (610,498). *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf. This figure from *six months* is nearly *39 times* the volume of disputes that the government originally anticipated *over a full year*.

85. Government reporting also shows that most disputes are initiated by a small number of providers and their representatives. The top ten initiating parties initiated about 71% of all disputes initiated in the last six months of 2024, and the top three initiating parties initiated about 43% of all disputes during that period. *Id.*

86. HaloMD is among the three most prolific filers of IDR process disputes. During the last six months of 2024, HaloMD initiated 134,318 disputes through the IDR process—which by itself exceeded the government's original estimate for total annual disputes **more than sixfold**. *See Federal IDR Supplemental Tables for Q3 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q3.xlsx; *Federal IDR Supplemental Tables for Q4 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q4-may-28-2025.xlsx. That means HaloMD was initiating an average of more than 746 disputes against health plans *per day. See id.*

87. As between just the Defendants and Anthem, Defendants initiated an average of more than 15 disputes against Anthem per day.

88. But Defendants did not merely initiate a steady volume of IDR process disputes each day. Instead, Defendants strategically collate and initiate hundreds of IDR process disputes against Anthem on the same day, most of which do not involve qualified IDR items or services

- 25 -

within the scope of the NSA's IDR process. Frequently, Defendants purposefully make no effort to initiate or pursue open negotiations before initiating a new dispute.

89. For example, on December 26, 2024, Defendants initiated an astounding 312 separate IDR proceedings against Anthem. 174 of the disputes—more than half—were not eligible for IDR in the first place. Yet in 88 of the disputes, based on false attestations of eligibility provided by Defendants, Anthem was ordered to pay an additional $1,445,629.78 from what was originally reimbursed, plus $52,246.63 in fees associated with the IDR process.

90. Defendants' goals are to interfere with Anthem's ability to effectively identify ineligible disputes and submit inappropriate payment offers to overwhelm the IDR system and the IDREs tasked with making applicability and payment determinations.

91. Through considerable operational burden and expense, Anthem has crafted workflows allowing it to identify most of the unqualified items or services and notify Defendants that the disputes do not quality for IDR. Yet despite Anthem's objections, most of Defendants' ineligible disputes reach a payment determination due to Defendants' knowingly false attestations of eligibility.

92. According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). IDREs also complain that they spend 50% to 80% of their time on eligibility determinations, 88 Fed. Reg. 75,744, 75,753 (Nov. 3, 2023). And IDREs have no incentive to dismiss disputes due to ineligibility because they only receive compensation if a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F).

93.     Thus, when receiving an avalanche of ineligible disputes from Defendants all at once, IDREs frequently rely on Defendants' false attestations of eligibility to reach and issue a payment determination on ineligible disputes.

94.     Since 2024, about *50%* of disputes from Defendants that reached a payment determination are ineligible for the IDR process, often despite objections from Anthem. From these fraudulent submissions alone, Defendants have received more than *$25 million* in illicitly obtained reimbursements.

**III.    Defendants Submit Outrageous Payment Offers to Inflate Payments on Both Eligible and Ineligible Disputes Above Billed Charges.**

95.     The final step in Defendants' scheme involves inflating their reimbursement demand to levels far beyond what was billed or what the market would support. The goal is to manipulate IDREs into selecting inflated amounts by anchoring the dispute to a grossly exaggerated number. By submitting a grossly inflated offer, Defendants artificially shift the IDRE's frame of reference upward. And due to systemic issues with the IDR process, Defendants frequently prevail with their unreasonable offer—even if it is far above market rates or even above what the Provider Defendants had billed.

96.     Congress directed IDR payment determinations to be made according to the QPA and several "additional circumstances," such as training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). In practice, however, IDRE payment determinations skew heavily in favor of providers and heavily in excess of the QPA.

97.     In the most recent reporting period, providers prevailed in *85%* of IDR payment determinations. *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024— Dec. 31, 2024*, CMS, *supra*. During that period, prevailing offers exceeded the QPA *85%* of the

time. *See id.* And studies from 2024 show that when providers prevail in IDR, they prevail at a median rate of over three times the QPA. *See* Zachary L. Baron et al., O'NEILL INSTITUTE, GEORGETOWN LAW, *2023 Data from the Independent Dispute Resolution Process: Select Providers Win Big*, available at https://oneill.law.georgetown.edu/publications/2023-data-from-the-independent-dispute-resolution-process-selectproviders-win-big/.

98.    IDREs are compensated on a per-dispute basis. *See* 42 U.S.C. § 300gg-111(c)(5)(F). Disputes are overwhelmingly initiated by providers. Thus, siding with providers incentivizes more providers to file more disputes, which generates greater compensation for the IDREs.

99.    Defendants know that IDREs select the provider's offer in more than 8 out of every 10 payment determinations, so they can frequently prevail with outrageous offers.

100.    Defendants also know that IDREs cannot consider the provider's charges when making a payment determination. 42 U.S.C. § 300gg-111(c)(5)(D). Congress prohibited IDREs from considering "inflated," "non-market based rates such as the providers' billed charges" because merely ***considering*** the provider's charge "may drive up consumer costs." H.R. Rep. No. 116-615, at 53, 57.

101.    With full knowledge that IDREs cannot consider the Provider Defendants' billed charges, Defendants do not disclose their billed charges to the IDRE and then submit offers that exceed the Provider Defendants' charges.

102.    Since 2024, Defendants fraudulently submitted thousands of inflated disputes through the IDR process where they requested and received an IDR award exceeding their billed charges. On average, Defendants' offers of payment in IDR represent an astonishing ***10,588%***

more than Anthem's QPA and *215%* more than the Provider Defendants' billed charges—
*resulting in IDR determinations exceeding billed charges by over $24 million*.

103.    These astronomical amounts far exceed what the Provider Defendants could expect
to receive for their services from patients or from health plans in a competitive market. Indeed,
prior to the enactment of the NSA, the Provider Defendants rarely, if ever, recovered their full
billed charges from patients or health plans. They *never* collected amounts above their charges.
But through their scheme to exploit the IDR process, Defendants' systematic requests for these
exorbitant amounts intentionally exploit the IDR process for undue gains at Anthem's expense.

**IV.    Harm to Anthem, Plan Sponsors, BlueCard Plans, and Consumers**

104.    As a result of Defendants' unlawful conduct, Anthem and its employer plan sponsor
customers have paid excessive amounts for medical services and incurred unnecessary
administrative and arbitration fees. The financial harm caused by Defendants' abusive practices is
ongoing and threatens the affordability and sustainability of health benefits for Anthem's
members.

105.    For a period from January 4, 2024, to April 30, 2025, Anthem's records show that
Defendants initiated a whopping 11,349 IDR proceedings against Anthem. However, the earliest
publicly available data published by CMS shows that the Provider Defendants began initiating
IDR against Anthem in the first quarter of 2023 (the earliest date CMS has published IDR data),
so the scheme likely began then or before.

106.    Anthem determined that approximately *50%* of the disputes from this period were
ineligible for IDR for reasons like failure to initiate mandatory open negotiations, Ohio's specified
state law governing the dispute, or that the services were not covered by the patient's health benefit
plan. For these ineligible disputes catalogued in Anthem's data, Defendants illicitly secured *more*

*than $25 million* in improper IDR awards (approximately *$15 million* of which the Provider Defendants improperly recovered as a result of fraudulently inflating their payment offers far above their billed charges).

107. Anthem also determined that over one thousand eligible disputes from this period were fraudulently inflated. For these inflated eligible disputes catalogued in Anthem's data, the Provider Defendants improperly recovered *more than $12 million* above their billed charges.

## THE LAROQUE FAMILY ENTERPRISE

108. The Provider Defendants and the HaloMD Defendants do not operate as separate, independent actors. Rather, they are components of a single fraudulent enterprise, controlled and directed by a closely-knit group of individuals with overlapping roles, shared infrastructure, and a unified financial interest in exploiting the IDR process and defrauding payors like Anthem. Their supposed separateness is a façade designed to conceal the coordinated nature of the scheme.

109. Defendant Alla LaRoque and her husband, Scott LaRoque, are at the center of the LaRoque Family Enterprise. The LaRoque Family Enterprise operates via a web of interrelated corporate entities they directly or indirectly control, including HaloMD and the Provider Defendants.

110. Scott LaRoque, a Texas resident, is the founder and Chief Executive Officer of MPOWERHealth. Based in Addison, Texas, MPOWERHealth serves more than 400 physicians, 55,000-plus patients and over 300 facilities in 24 states, including Ohio. MPOWERHealth is located at 5080 Spectrum Drive, Suite 1100E, Addison, Texas, 75001 (the "5080 Spectrum Address") and, according to public records, is also associated with the address 2915 W Bitters Rd, San Antonio, Texas, 78248 (the "2915 W Bitters Address").

111. Alla LaRoque, HaloMD, and the Provider Defendants have discrete connections to the LaRoques and MPOWERHealth and specific roles within the LaRoque Family Enterprise.

I.     **Defendant Alla LaRoque**

112.    Defendant Alla LaRoque, the wife of Scott LaRoque, is the founder and President of HaloMD. She sits on the board of MPOWERHealth and previously served as MPOWERHealth's Chief Operating Officer.

113.    As the founder and President of HaloMD, Alla LaRoque had intimate knowledge about the core aspects of HaloMD's business operations, including the wrongful activities alleged herein. She runs HaloMD as a hands-on manager, overseeing the company's operations, business practices, and finances.

114.    Alla LaRoque presents herself as an authority on the NSA's IDR process and frequently appears at public events to bolster her profile. However, behind the scenes, her actions raise serious concerns about fairness and integrity in the implementation of the No Surprises Act.

115.    Under the guise of "fair reimbursement," she has repeatedly pushed agendas that undermine the balance of the IDR process, often guiding providers to exploit loopholes and procedural gaps in the IDR framework—giving providers "tactical tools to optimize reimbursement," regardless of merit.

116.    She also has, on multiple occasions, argued that payors (like Anthem) should face punitive consequences for asserting eligibility objections—even when such objections are valid.

II.    **Defendant HaloMD**

117.    HaloMD is the vehicle through which Defendants flood the IDR process with knowingly ineligible disputes.

118.    HaloMD markets itself as "the premier expert in Independent Dispute Resolution (IDR)[.] … Our deep expertise, advanced technology, and strategic legal approaches position us as leaders in this space. … [W]e empower out-of-network providers to secure sustainable,

predictable revenue streams. Backed by a dedicated team and industry-leading success rates, we deliver the financial outcomes that health care providers, practice leaders, and executives rely on for long-term financial stability." *See* https://halomd.com/ (last visited June 1, 2025).

119.    HaloMD represents out-of-network providers who were key drivers in surprise billing, including IONM providers, and administers the IDR process on their behalf.

120.    HaloMD touts its "proprietary platform" as one founded with "advanced technology and AI-driven infrastructure[.]" *Id*. HaloMD also represents that it "instantly assesses each case for eligibility under The No Surprises Act and relevant state regulations." Providers submit services for dispute in the IDR process through HaloMD's portal. *Id.*

121.    HaloMD further represents that it "gathers and organizes the necessary documentation [from the provider], [and] prepar[es] a compelling case that highlights the provider's position, ensuring nothing is overlooked[.]" *Id.*

122.    Upon information and belief, HaloMD leverages AI as part of its fraudulent billing scheme to flood the IDR system with ineligible disputes.

123.    HaloMD operates on a commission-based reimbursement model. Its website states: "We don't get paid until you get paid." *Id*. HaloMD thus has a financial incentive to (1) bring as many services as possible through the IDR process, regardless of the merits or the applicability of the NSA to those disputes, and (2) seek the highest possible monetary award for its provider clients in the IDR process. The Provider Defendants share these same financial incentives.

124.    HaloMD is connected to the LaRoque Family Enterprise through Alla LaRoque, its founder and President. By serving as the founder and President of HaloMD and board member for MPOWERHealth, Alla LaRoque oversees and directs the activities of both the platform submitting IDR disputes and the providers on whose behalf those disputes are submitted.

125.     Social media posts confirm the family-run, tightly coordinated nature of the enterprise. In one post from April 2025, Scott and Alla LaRoque are described as "[t]he magnificent couple, owner, founder of MPower Health and HaloMD." They routinely appear together at public events representing both companies.

126.     Megan Rausch, the Chief Operating Officer of HaloMD, also serves as the Vice President of Revenue Cycle Management for MPOWERHealth, ensuring alignment and coordination across the scheme.

127.     MPOWERHealth and HaloMD also appear to share a physical business address, reinforcing the operational integration. According to public records, HaloMD uses the 2915 W Bitters Address that MPOWERHealth also uses. MapQuest and other mapping tools confirm that both HaloMD and MPOWERHealth list the 5080 Spectrum Address as their business address. This physical overlap is additional confirmation that these entities are operating not independently, but as components of a single, centralized operation.

128.     The websites for HaloMD and MPOWERHealth are also nearly identical in design and structure, and their contact pages are directly linked. HaloMD's "Join Our Team" page links applicants back to MPOWERHealth's domain. Advertisements for jobs posted on the internet conflate the various entities. For example, one advertisement for a "State IDR Specialist" lists the employer as MPOWERHealth, but in the body of the description under the section "Who We Are" lists HaloMD as the employer and describes HaloMD.

## III.     The Provider Defendants

129.     The LaRoque Family Enterprise uses the Provider Defendants' purported services as the basis for initiating IDR process disputes.

130.    Public records show that the Provider Defendants are all IONM providers affiliated with the same company: MPOWERHealth.

131.    Defendant Evokes is a wholly owned subsidiary of Medsurant Holdings, LLC ("Medsurant"), which operates under the trade name Medsurant Health. A subsidiary of Medsurant, Medsurant Intermediate, LLC ("Medsurant Intermediate"), owns the trademark for Evokes. Upon information and belief, in or around January 2025, Medsurant Health was acquired by MPOWERHealth. According to the National Provider Identifier (NPI) registry, Medsurant Intermediate also has a business address at the 5080 Spectrum Address. Notably, Roxanna ("Roxy") Laroque, Director of Client Experience at MPOWERHealth, is listed as the Authorized Official for Medsurant Intermediate. In addition, Evokes recently filed a change of registered agent with the Ohio Secretary State that shows it was filed by Brenda Thiele from the 5080 Spectrum Address. Upon information and belief, Thiele is MPOWERHealth's Senior Manager of Treasury and former Chief of Staff and Director of Operations.

132.    Defendant Midwest Neurology has a mailing address of 1141 N Loop 1604 E #105-612, San Antonio, Texas, 78232 (the "1141 N Loop Address"). Upon information and belief, the 1141 N Loop Address is frequently associated with MPOWERHealth entities. According to the NPI registry, the Authorized Official for Midwest Neurology is Roxy LaRoque from MPOWERHealth.

133.    Disputes submitted to the IDR portal on behalf of Evokes and Midwest Neurology use the same email address: medsurant@halomd.com.

134.    According to the NPI registry, Defendant OCM's Authorized Official is Roxy LaRoque from MPOWERHealth.

135. Defendant Value Monitoring is located at the 2915 Bitters Address. Value Monitoring also uses the 1141 N Loop Address as a mailing address. And according to the NPI registry, Value Monitoring's Authorized Official is Roxy LaRoque from MPOWERHealth.

136. In sum, the Provider Defendants are not independent clients of HaloMD. They are closely linked through shared ownership, leadership, staff, branding, web infrastructure, and physical office space. MPOWERHealth sits at the center of this scheme, functioning as a command-and-control hub that connects and coordinates the activities of all Defendants. HaloMD, far from being a neutral billing platform, operates as an engine of fraud—instrumental in executing a scheme designed to exploit the IDR process for unlawful financial gain.

## IV. The LaRoque Family Enterprise Exploits the IDR Process at the Expense of Anthem.

137. The HaloMD Defendants and the Provider Defendants together form the LaRoque Family Enterprise for the common purpose of enriching themselves at the expense of Anthem by fraudulently inducing and compelling Anthem to pay for services that were not eligible for the IDR process, and inflating the amounts required to be paid on ineligible and eligible services above the amounts billed to patients.

138. Beginning no later than January 2024, the LaRoque Family Enterprise commenced a pattern of fraudulent, intentional, and reckless activity whereby it: (1) knowingly submitted thousands of ineligible and inflated disputes to Anthem, misrepresenting their eligibility for IDR under the NSA; (2) strategically initiated massive volumes of IDR disputes simultaneously against Anthem; and (3) improperly inflated payment offers that far exceeded what the Provider Defendants could have received from patients or health plans in a competitive market and, in many cases, were twice or more the Provider Defendants' billed charges.

139.    Between January 4, 2024, and April 30, 2025, the LaRoque Family Enterprise submitted several thousands of ineligible disputes against Anthem via interstate wires for which it illicitly secured a total of *more than $25 million* in improper IDR awards (approximately *$15 million* of which the Provider Defendants improperly recovered as a result of fraudulently inflating their payment offers far above their billed charges). On each occasion, Defendants knowingly misrepresented the eligibility of their disputes.

140.    In addition, between January 4, 2024, and April 30, 2025, the LaRoque Family Enterprise submitted over one thousand inflated eligible disputes against Anthem via interstate wires for which it received *more than $12 million* above the Provider Defendants' billed charges.

141.    The LaRoque Family Enterprise's fraudulent scheme is evidenced by numerous specific predicate acts of wire fraud, including but not limited to the following:

### A. One Care Monitoring, LLC

### *DISP-2735036 (Ineligible State Law Claim)*

142.    The IDR proceeding captioned DISP-2735036 involved intraoperative neurophysiology monitoring that OCM rendered on July 10, 2024, to a member of a fully insured plan administered by Anthem. The member's plan is subject to state law and, therefore, Ohio's surprise billing law—rather than the NSA—governed the reimbursement rate for services.

143.    When Anthem issued payment, the remittance advice sent to OCM reflected that the claim was processed pursuant to explanation code AVS. The description of this code, printed at the end of the remittance advice, was: "This was adjusted to follow Ohio balance billing laws and rules. … Payment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select

the Dispute button. As a reminder, the member can only be billed their copay, deductible or percentage of the cost for this care."

144.    On January 23, 2025, Shirley Eaton of HaloMD, on behalf of and in coordination with OCM, using the email address ArbitrationOH@halomd.com, sent Anthem an open negotiation notice pursuant to Ohio's state surprise billing law for these intraoperative neurophysiology monitoring services. The correspondence stated, "We are an OON Provider and are writing to notify you of our request to negotiate a fair reimbursement rate for the above referenced claim … As [*sic*] is the process mandated by Ohio legislation H.B. 388_133, effective Sept 7, 2021, enacted Jan 12, 2022, for Out of Network Provider reimbursement disputes. This letter serves as a formal request to negotiate with BCBS Anthem failure [*sic*] to issue attempt to negotiate will serve as impasse. And [*sic*] we will have no alternative but to proceed with the Ohio arbitration process."

145.    Even though they had already submitted notice of negotiation to initiate the state dispute resolution process, on January 24, 2025, HaloMD, on behalf of and in coordination with OCM, using the email address nsa@halomd.com, sent a notice of open negotiation to Anthem to initiate the federal dispute process.

146.    On February 18, 2025, Anthem informed HaloMD and OCM that the claim did not qualify for IDR and directed HaloMD and OCM to consult its remittance advice for instructions related to surprise billing. Neither OCM nor HaloMD responded to Anthem's assertion of ineligibility. In addition, on March 5, 2025, Anthem informed HaloMD and OCM that it was in receipt of the Ohio negotiation request and Anthem was unable to offer any additional payment as reimbursement was calculated pursuant to OHIO REV. CODE § 3902.51(B)(1) of the Ohio Surprise Billing Law.

147.    Nevertheless, on March 31, 2025, HaloMD, again on behalf and in coordination with OCM, initiated IDR by submitting an IDR notice under the email address nsa@halomd.com, which falsely attested that the intraoperative neurophysiology monitoring services rendered by OCM on July 10, 2024, to a member of a fully insured plan administered by Anthem were eligible for IDR under the NSA, despite clear documentation from Anthem explaining that Ohio's state billing law applied and the dispute did not qualify for IDR. This notice of ineligibility was sent to both HaloMD and OCM, yet neither HaloMD nor OCM withdrew the dispute. As a result of HaloMD and OCM's fraudulent attestations, Anthem was required to pay $12,330.78—***more than double OCM's billed charges***. Anthem also paid $503 in unnecessary IDR-related fees.

### ***DISP-2095632 (Late Filing & Ineligible State Law Claim)***

148.    The IDR proceeding captioned DISP-2095632 involved intraoperative neurophysiology monitoring that OCM rendered on June 2, 2024, to a member of a fully insured plan administered by Anthem. The member's plan is subject to state law and, therefore, Ohio's surprise billing law—rather than the NSA—governed the reimbursement rate for services.

149.    When Anthem issued payment, the remittance advice sent to OCM reflected that the claim was processed pursuant to explanation code AVS. The description of this code, printed at the end of the remittance advice, noted: "Payment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code."

150.    Even though OCM and HaloMD knew that the claim was subject to Ohio's state surprise billing law and not the NSA, on September 27, 2024, HaloMD, again acting for and in coordination with OCM and using the email address nsa@halomd.com, sent a notice of open negotiation to Anthem to initiate the federal IDR process. The notice of open negotiation proposed settlement of $35,981.47, which was ***far more*** than the $13,500 OCM had billed for the service.

151. On October 7, 2024, Anthem addressed its response to the notice of open negotiation to OCM, with attention to Megan Rausch (HaloMD), at the 2915 W Bitters Address. The letter stated that the dispute did not qualify for IDR and directed OCM to consult its remittance advice for instructions related to surprise billing. Neither OCM nor HaloMD responded to Anthem's assertion of ineligibility.

152. If the services had qualified for IDR, the deadline to initiate IDR would have been four business days after the 30-business-day open negotiation period, or November 12, 2024. Yet IDR was not initiated until November 15, 2024, when HaloMD, again acting for and in coordination with OCM and using the email address nsa@halomd.com, falsely attested that the services were a qualified item or service within the scope of the federal IDR process—despite being told by Anthem the NSA did not apply and having missed the IDR initiation deadline.

153. Anthem responded to the IDR initiation to assert that IDR was not applicable to the dispute, stating (1) "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies" and (2) "the provider did not submit its IDR initiation notice within 4 business days at the end of the negotiation period." This notice of ineligibility was sent to both HaloMD and OCM, yet neither HaloMD nor OCM withdrew the dispute. Nevertheless, as a result of HaloMD and OCM's fraudulent attestations, Anthem was required to pay $36,992.34—***nearly triple OCM's billed charges***. Anthem also paid $510 in unnecessary IDR-related fees.

**B. Evokes, LLC**

***DISP-2305623 (Ineligible State Law Claim)***

154. The IDR proceeding captioned DISP-2305623 involved an electromyography procedure that Evokes rendered on October 1, 2024, to a member of a fully insured Anthem health

plan. The member's plan is subject to state law and, therefore, Ohio's surprise billing law—rather than the NSA—governed the reimbursement rate for services.

155. When Anthem issued payment, the remittance advice sent to Evokes reflected that the claim was processed pursuant to explanation code AVS. The description of this code, printed at the end of the remittance advice, noted: "Payment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code."

156. Even though Evokes and HaloMD knew that the claim was subject to Ohio's state surprise billing law and not the NSA, HaloMD, on behalf of and in coordination with Evokes, sent a notice of open negotiation to Anthem to initiate the federal IDR process. On November 7, 2024, Anthem addressed its response to the notice of open negotiation to Evokes, with attention to Megan Rausch (HaloMD), at the 2915 W Bitters Address, stating that the dispute did not qualify for IDR and directing Evokes to consult its remittance advice for instructions relating to surprise billing. Neither Evokes nor HaloMD responded to Anthem's assertion of ineligibility.

157. If the services had qualified for IDR, the deadline to initiate IDR would have been four business days after the 30-business-day open negotiation period, or December 12, 2024. Yet IDR was not initiated until December 24, 2024, when HaloMD, again acting for and in coordination with OCM, falsely attested that the services qualified for federal IDR—despite being told by Anthem the NSA did not apply because a state surprise billing law applied and having missed the IDR initiation deadline. Notably, HaloMD initiated this IDR with the email address medsurantarbitrationnsa@halomd.com, despite Evokes having provided and billed for the underlying services.

158. Anthem submitted an objection to eligibility, asserting: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." This notice of ineligibility

was sent to both HaloMD and Evokes, yet neither HaloMD nor Evokes withdrew the dispute. Nevertheless, as a result of HaloMD and Evokes' fraudulent attestations, Anthem was required to pay $7,606.54—*more than 21 times the billed amount*. Anthem also paid $512 in unnecessary IDR-related fees.

### *DISP-2406466 (Non-Covered Service)*

159.    The IDR proceeding captioned DISP-2406466 involved an intraoperative neurophysiology procedure that Evokes rendered on June 25, 2024, to a member of a fully insured Anthem health plan. Evokes billed $8,000.00 in charges for the service. No benefits were available under the member's health benefit plan as the member had failed to pay the plan's premium amount, and Anthem therefore appropriately denied coverage and reimbursement for the service.

160.    On January 13, 2025, HaloMD, on behalf of and coordination with Evokes, falsely attested that the services Evokes rendered were qualified for IDR. Notably, HaloMD initiated this IDR with the email address medsurantarbitrationnsa@halomd.com, despite Evokes having provided and billed for the underlying services.

161.    Anthem submitted an objection to eligibility, which was also addressed to Evokes, stating: "The dispute includes items or services not covered by the member's insurance policy." Neither HaloMD nor Evokes withdrew the dispute following this notice of ineligibility. Nevertheless, as a result of HaloMD and Evokes' fraudulent attestations, Anthem was required to pay $12,330.78, *exceeding the $8,000 billed amount and over 100 times the applicable QPA* ($115.92)—despite the procedure not being eligible for coverage in the first place. Anthem also paid $540 in unnecessary IDR-related fees.

### C.  Midwest Neurology, LLC

**_DISP-801545 (No Open Negotiation; Ineligible State Law Claim)_**

162.    The IDR proceeding captioned DISP-801545 involved a service that Midwest Neurology rendered on November 8, 2022, to a member of a fully insured Anthem plan. The member's plan is subject to state law and, therefore, Ohio's surprise billing law—rather than the NSA—governed the reimbursement rate for services.

163.    When Anthem issued payment, the remittance advice sent to Midwest Neurology reflected that the claim was processed pursuant to explanation code AVS. The description of this code, printed at the end of the remittance advice, noted: "Payment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code."

164.    Even though the dispute clearly fell under Ohio's surprise billing law and neither Midwest Neurology nor HaloMD initiated open negotiations for this service, on December 6, 2023, HaloMD, using the email address nsa@halomd.com, on behalf of and in coordination with Midwest Neurology, falsely attested to IDR eligibility.

165.    Anthem submitted an objection to eligibility, which was also addressed to Midwest Neurology, asserting that IDR was not applicable to the dispute, noting that Ohio's state billing law applied to the claim and that Midwest Neurology had not engaged in the required open negotiation period. Neither HaloMD nor Midwest Neurology withdrew the dispute following this notice of ineligibility. As a result of HaloMD and Midwest Neurology's fraudulent attestations, Anthem was required to pay $3,584.27 for the ineligible service along with $510 in unnecessary IDR-related fees.

166.    Notably, Midwest Neurology and HaloMD attempted to initiate IDRs for other services provided to the same member on the same date, all of which were eventually dismissed

as ineligible—further demonstrating the systematic and indiscriminate nature of the scheme. Two such disputes (DISP-801547 and DISP-801543) were both determined to be ineligible due to the applicability of Ohio's state surprise billing law. A third dispute (DISP-801544) was determined to be ineligible due to the type of service not being covered by the NSA.

### D. Value Monitoring

#### DISP-1549333 (No Open Negotiation; Ineligible State Law Claim)

167.    The IDR proceeding captioned DISP-1549333 involved a service that Value Monitoring provided to a member of a fully insured Anthem plan on May 19, 2023. The member's plan is subject to state law and, therefore, Ohio's surprise billing law—rather than the NSA— governed the reimbursement rate for services.

168.    When Anthem issued payment, the remittance advice sent to Value Monitoring reflected that the claim was processed pursuant to explanation code AVS. The description of this code, printed at the end of the remittance advice, noted: "Payment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code."

169.    Value Monitoring initiated negotiations under Ohio's surprise billing law in January 2024. Anthem responded by letter addressed to Value Monitoring stating that it was unable to offer any additional payment on the claim as reimbursement was calculated pursuant to OHIO REV. CODE § 3902.51(B)(1) of the Ohio Surprise Billing Law. The letter also stated: "If you do not accept this adjusted payment as payment in full, you can request arbitration for Ohio Surprise Billing https://dispute.maximus.com/oh/indexOHA."

170.    Neither Value Monitoring nor HaloMD requested arbitration under Ohio's state surprise billing law or initiated open negotiations under the federal process (a mandatory prerequisite to IDR for eligible services). Nevertheless, on March 6, 2025, HaloMD, using the

email address nsatexas@halomd.com, on behalf of and in coordination with Value Monitoring, falsely certified the service as IDR-eligible.

171.    Anthem submitted an objection to eligibility, which was also addressed to Value Monitoring, stating: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Neither HaloMD nor Value Monitoring withdrew the dispute following Anthem's explicit notice of ineligibility. As a result of HaloMD and Value Monitoring's fraudulent attestations, Anthem was required to pay $55,417.60—***roughly five times the billed amount*** of $10,220. Anthem also paid $915 in unnecessary IDR-related fees.

### *DISP-1480121 (Ineligible State Law Claim)*

172.    The IDR proceeding captioned DISP-1480121 involved a service that Value Monitoring provided to a member of a fully insured plan on April 4, 2024. The member's plan is subject to state law and, therefore, Ohio's surprise billing law—rather than the NSA—governed the reimbursement rate for services.

173.    When Anthem issued payment, the remittance advice sent to Value Monitoring reflected that the claim was processed pursuant to explanation code AVS. The description of this code, printed at the end of the remittance advice, noted: "This was adjusted to follow Ohio balance billing laws and rules. … Payment is made pursuant to division (B)(1) of section 3902.51 of the OH Revised Code. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member can only be billed their copay, deductible or percentage of the cost for this care."

174.    Even though the dispute clearly fell under Ohio's surprise billing law, on June 27, 2024, HaloMD, using the email address nsatexas@halomd.com, again on behalf of and in

coordination with Value Monitoring, falsely attested to IDR eligibility. Anthem submitted an objection to eligibility, which was also addressed to Value Monitoring, stating: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Neither HaloMD nor Value Monitoring withdrew the dispute following this notice of ineligibility.

175. As a result of HaloMD and Value Monitoring's fraudulent attestations, Anthem was required to pay $79,168 for the ineligible service—*over five times more than Value Monitoring's billed charges*—along with $512 in unnecessary IDR-related fees.

### DISP-979638 (No Open Negotiation; Ineligible State Law Claim)

176. The IDR proceeding captioned DISP-979638 involved a service that Value Monitoring provided to a member of a fully insured plan on September 29, 2023. The member's plan is subject to state law and, therefore, Ohio's surprise billing law—rather than the NSA—governed the reimbursement rate for services.

177. Neither Value Monitoring nor HaloMD pursued open negotiations under the federal process, which is a mandatory prerequisite to IDR for eligible services. Yet, despite no open negotiation and clear application of Ohio's state surprise billing law, on February 12, 2024, HaloMD, using the email address nsatexas@halomd.com, on behalf of and in coordination with Value Monitoring, falsely certified the service as IDR-eligible.

178. Anthem submitted an objection to eligibility, which was also addressed to Value Monitoring, stating: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies" and "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA." Neither HaloMD nor Value Monitoring withdrew the dispute following Anthem's explicit notice of ineligibility.

179.    As a result of HaloMD and Value Monitoring's fraudulent attestations, Anthem was required to pay $17,670.77—***roughly four times the billed amount*** of $4,745. Anthem also paid $915 in unnecessary IDR-related fees.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF RICO
### 18 U.S.C. § 1962(c)
### (Against All Defendants)

180.    Anthem repeats and realleges the allegations in Paragraphs 1 through 179 in this Complaint as if fully set forth at length herein.

181.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

182.    At all relevant times, the HaloMD Defendants and the Provider Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

183.    The HaloMD Defendants and the Provider Defendants together formed an association-in-fact enterprise (the "LaRoque Family Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), for the purposes of stealing and defrauding funds from Anthem through the fraudulent submission of ineligible and inflated disputes under the federal IDR process.

184.    For several years, the LaRoque Family Enterprise has sought to illegally increase its profits by: (1) knowingly submitting false and fraudulent attestations of eligibility for services and disputes that they know are ineligible for the IDR process; (2) strategically initiating massive volumes of IDR disputes simultaneously against Anthem; and (3) improperly inflating payment

offers that far exceed what the Provider Defendants could have received from patients or health plans in a competitive market and, in many case, are twice or more the Provider Defendants' billed charges.

185.     At all relevant times, the LaRoque Family Enterprise: (a) functioned as a continuing unit with an ascertainable structure separate and distinct from the pattern of racketeering activity; (b) shared a common purpose of furthering their illegal scheme and increasing their revenues and profits at the expense of Anthem; (c) had systematic linkage to each other through interpersonal and contractual relationships, financial ties, shared correspondence, and continuing coordination of activities; and (d) had sufficient longevity for the enterprise to pursue its purpose. Each member of the LaRoque Family Enterprise participated in the operation and management of the enterprise, including patterns of racketeering activity, and shared in the profits illicitly obtained due to the enterprise's fraudulent activity.

186.     The LaRoque Family Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of wire fraud (*i.e.*, the submission of the ineligible and inflated disputes to Anthem through the IDR process), by creating and maintaining records, by negotiating and executing various agreements, and by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds.

187.     The HaloMD Defendants and the Provider Defendants carried out, or attempted to carry out, a scheme to defraud Anthem by knowingly conducting or participating, directly or indirectly, in the conduct of the LaRoque Family Enterprise through a pattern of racketeering

activity within the meaning of 18 U.S.C. § 1961(1) that consisted of numerous and repeated violations of the federal wire fraud statute, which prohibits the use of any interstate wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. § 1343.

188.    The HaloMD Defendants and the Provider Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of U.S.C. § 1343) within the past ten years. The multiple acts of racketeering activity that the Defendants committed, or aided and abetted in the commission of, were related to each other and posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The predicate acts also had the same or similar results, participants, victims, and methods. The predicate acts were related and not isolated events.

189.    The Defendants participated in the scheme to defraud using the internet to transmit wires in interstate commerce.

190.    Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by interstate wire for the purpose of executing the unlawful scheme to defraud funds from Anthem by means of false pretenses, misrepresentations, promises and omissions. Specifically, the disputes Defendants submitted through the federal IDR process contained uniform misrepresentations that the disputes were eligible for that process and often contained inflated amounts. The predicate acts all had the purpose of substantially harming Anthem's business and property, while simultaneously generating substantial revenues for the members of the LaRoque Family Enterprise. The predicate acts were committed or caused to be committed by the HaloMD Defendants and the Provider Defendants through their participation in the LaRoque Family Enterprise and in furtherance of its fraudulent scheme.

191. Defendants' predicate acts of racketeering—which began no later than January 2024 and have occurred continuously and systematically through the present day—committed by interstate wires, include: (a) submitting claims through the online IDR eligibility portal that were ineligible for the IDR process; (b) demanding outrageous payments far in excess of their charges, much less a commercially reasonable amount; (c) initiating hundreds of disputes at the same time and in such a way as to make it difficult for Anthem to reasonably identify and object to all ineligible disputes; (d) engaging in the IDR process in bad faith; and (e) procuring payments on disputes that were ineligible for IDR and/or or grossly inflated. The fraudulent disputes submitted to Anthem that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the Section titled "The LaRoque Family Enterprise," *supra*.

192. The members of the LaRoque Family Enterprise all shared a common purpose to enrich themselves at the expense of Anthem by fraudulently inducing and compelling Anthem to pay exorbitant amounts for services that were not eligible for the IDR process and causing Anthem to pay inflated amounts for eligible services far exceeding their billed charges.

193. The HaloMD Defendants and the Provider Defendants aided and abetted others in the violations of the above laws, rendering them indictable as principals in the 18 U.S.C. § 1343 offenses.

194. The members of the LaRoque Family Enterprise have profited, and continue to profit, substantially from the fraudulent billing scheme, ultimately receiving ***tens of millions of dollars*** in illicitly obtained reimbursements and IDR-related fees. These payments, disbursed through interstate wire facilities, each constitute a separate violation of 18 U.S.C. § 1343.

195. The members of the LaRoque Family Enterprise knew their actions would cause harm to Anthem. Nevertheless, the members of the LaRoque Family Enterprise engaged in a

scheme of deception, that utilized the internet and wire transfers as part of their fraud, in order to steal funds from Anthem by means of false pretenses, misrepresentations and omissions.

196. The LaRoque Family Enterprise's fraudulent conduct and participation in the racketeering activity described herein has directly and proximately caused Anthem to incur tens of millions of dollars in damages.

197. By reason of its injury, Anthem is entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT II**
**VIOLATION OF RICO**
**18 U.S.C. § 1962(d)**
**(Against All Defendants)**

198. Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

199. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

200. The LaRoque Family Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

201. The HaloMD Defendants and the Provider Defendants are employed by and/or associated with the LaRoque Family Enterprise.

202. The HaloMD Defendants and the LaRoque Family Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the LaRoque Family Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the wire fraud statute, 18 U.S.C. § 1343, based upon the use of interstate wire facilities to execute the profit-making fraudulent billing scheme described herein. The

- 50 -

fraudulent disputes submitted to Anthem that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the Section titled "The LaRoque Family Enterprise," *supra*. The HaloMD Defendants and the Provider Defendants knew of, agreed to and acted in furtherance of the common overall objective (*i.e.*, to defraud Anthem and its plan sponsors of money) by submitting or facilitating the submission of fraudulent ineligible and inflated disputes to Anthem through the IDR process.

203.    The LaRoque Family Enterprise's fraudulent conduct and participation in the racketeering activity described herein has directly and proximately caused Anthem to incur tens of millions of dollars in damages.

204.    By reason of its injury, Anthem is entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## COUNT III
## VIOLATION OF THE OHIO CORRUPT ACTIVITY ACT
## OHIO REV. CODE §§ 2923.31, *et seq.*
### (Against All Defendants)

205.    Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

206.    Anthem brings this claim against the HaloMD Defendants and the Provider Defendants, each of whom is a "person" within the meaning of OHIO REV. CODE § 2923.31(G).

207.    For efficiency and to avoid repetition, for purposes of this claim, Anthem incorporates by reference the paragraphs of Count I concerning the LaRoque Family Enterprise.

208.    As alleged above, each of the HaloMD Defendants and the Provider Defendants were members of an association-in-fact enterprise, the LaRoque Family Enterprise, within the meaning of OHIO REV. CODE § 2923.31(C).

209. As alleged above, each of the HaloMD Defendants and the Provider Defendants conducted and participated in the conduct of the affairs of LaRoque Family Enterprise through a pattern of "corrupt activities" as defined in OHIO REV. CODE § 2923.31(I)(1) and (2).

210. As previously alleged, each of the HaloMD Defendants and the Provider Defendants engaged in a pattern of corrupt activities defined as "racketeering activities" in 18 U.S.C. § 1961(1)(B), including multiple acts of wire fraud (18 U.S.C. § 1343).

211. Defendants also each engaged in a pattern of acts that constituted telecommunications fraud (OHIO REV. CODE § 2913.05).

212. As described above, each of the HaloMD Defendants and the Provider Defendants executed their unlawful scheme by (a) submitting disputes through the online IDR eligibility portal that were ineligible for the IDR process; (b) demanding outrageous payments far in excess of their charges, much less a commercially reasonable amount; (c) initiating hundreds of disputes at the same time and in such a way as to make it impossible for Anthem to reasonably identify and object to all ineligible disputes; (d) engaging in the IDR process in bad faith; and (e) procuring payments from Anthem on disputes that were ineligible for IDR and/or grossly inflated.

213. Each of the HaloMD Defendants and the Provider Defendants knew their unlawful and fraudulent scheme was causing harm to Anthem and actively advanced it.

214. Each of the HaloMD Defendants and the Provider Defendants formed and pursued their common purpose through the confidential personal interactions that they had.

215. Each of the HaloMD Defendants and the Provider Defendants violated the Ohio Corrupt Activity Act by engaging in multiple acts of wire fraud.

216. Defendants further violated the Ohio Corrupt Activity Act by committing acts in furtherance of the LaRoque Family Enterprise's common purpose and fraudulent scheme that

constitute telecommunications fraud (OHIO REV. CODE § 2913.05), including acts intended to disseminate or transmit writings, data, signs, signals, pictures, sounds or images by means of wire, radio, satellite, telecommunication, telecommunications devices or services in furtherance of the scheme to defraud.

217.    The LaRoque Family Enterprise's common purpose and fraudulent scheme was intended to, and did, utilize interstate wire facilities for the commission of their fraud in violation of 18 U.S.C. § 1343 (wire fraud).

218.    The end result of the HaloMD Defendants and the Provider Defendants' fraudulent scheme and common purpose was to continuously achieve financial gain for its members.

219.    The HaloMD Defendants and the Provider Defendants' violations of law and their pattern of racketeering activity directly and indirectly caused Anthem's injury. Their pattern of corrupt activity logically, substantially and foreseeably caused injuries to Anthem.

220.    Anthem seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; punitive damages; attorney's fees and all costs; expenses of suit; and pre- and post-judgment interest.

### COUNT IV
### THEFT BY DECEPTION
### (Against All Defendants)

221.    Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

222.    The Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, knowingly and intentionally submitted false attestations to the Departments, the IDREs, and Anthem. This directly resulted in Defendants wrongfully obtaining tens of millions of dollars in fraudulently obtained IDR payments, which constitutes theft of property by deception. In doing so, Defendants engaged in criminal conduct prohibited by Ohio law, which provides that

"[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services … [b]y deception." OHIO REV. CODE § 2913.02(A)(3).

223.    Deception is defined for purposes of Section 2913.02(A)(3) as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." OHIO REV. CODE § 2913.01(A).

224.    While Section 2913 is a criminal statute, Ohio law provides a civil right of action, pursuant to which "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code." OHIO REV. CODE § 2307.60(A)(1). No criminal conviction is necessary for liability under Section 2307.60.

225.    In an action brought pursuant to OHIO REV. CODE § 2307.60(A), a plaintiff may recover liquidated damages in an amount three times the value of the property subject to the theft offense. OHIO REV. CODE § 2307.61(A)(b)(ii).

226.    As set forth in more detail above, the Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, acquired funds from Anthem in the form of payment of IDR determinations by means of knowingly and intentionally submitting false attestations to Anthem, the IDREs, and the Departments.

227. The HaloMD Defendants and the Provider Defendants obtained these funds from Anthem by creating the impression through its false attestations submitted to the Anthem, the IDREs, and the Departments that the services and disputes at issue were eligible for IDR when Defendants knew that these impressions were false.

228. Defendants failed to correct these false impressions at any time after initiating the IDR process or after obtaining IDR payment determinations in favor of the Defendants relating to disputes that they knew were not eligible for the IDR process.

229. Each of the Defendants knowingly authorized, participated in, or ratified the submission of the false attestations and abuse of the IDR process.

230. As a result of Defendants' deceit, Anthem was ordered to pay, and did pay, tens of millions in ineligible and/or inflated IDR payment determinations. Anthem is entitled to recover three times the amount of the funds that it paid to Defendants on ineligible and/or inflated IDR payment determinations, including any portion thereof retained by the HaloMD Defendants as compensation under its arrangements with the Provider Defendants for such awards.

## COUNT V
## CIVIL CONSPIRACY
### (Against All Defendants)

231. Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

232. The HaloMD Defendants and the Provider Defendants conspired to implement the scheme described herein, resulting in harm to Anthem.

233. Specifically, each of the Provider Defendants retained the HaloMD Defendants to represent them in the ineligible IDR disputes.

234. Upon information and belief, the HaloMD Defendants and the Provider Defendants entered into agreements, either express or tacit, to defraud Anthem through the abuse of the IDR

process and commit the herein described unlawful acts, including wire fraud, fraudulent misrepresentation, and theft by deception.

235.    As detailed above, including in Paragraphs 103 through 179, the HaloMD Defendants and Provider Defendants maintain a joint and carefully orchestrated unlawful scheme through which they commit these unlawful acts.

236.    Each co-conspirator played an integral role in carrying out the scheme, including providing funding, directing billing practices, and facilitating the submission of improper disputes and IDR proceedings.

237.    As a result of the orchestrated scheme between the HaloMD Defendants and the Provider Defendants to submit material misrepresentations to Anthem, the IDREs, and the Departments regarding IDR eligibility, Anthem has suffered substantial damages in the form of payment of IDR fees and IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

**COUNT VI**
**VIOLATION OF OHIO'S DECEPTIVE TRADE PRACTICES ACT**
**OHIO REV. CODE § 4165.02**
**(Against All Defendants)**

238.    Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

239.    Defendants' conduct constitutes deceptive acts in violation of Ohio's Deceptive Trade Practices Act.

240.    Anthem and the Defendants fit within the definition of "person" under OHIO REV. CODE § 4165.01(D), meaning the Defendants are subject to the statute's prohibitions on certain deceptive practices, and Anthem is empowered to bring a claim relating to a violation of the Ohio Deceptive Trade Practices Act.

- 56 -

241. By falsely representing to Anthem, the IDREs, and the Departments that items or services were eligible for IDR resolution, Defendants represented that the services in dispute had sponsorship, approval, or characteristics (*i.e.*, that they were within the scope of the NSA and qualified for IDR) when, in fact, the services did not (*i.e.*, they were ineligible for IDR, despite Defendants' false attestation to the contrary in the IDR initiation notices), in violation of OHIO REV. CODE § 4165.02(A)(7).

242. By falsely representing to Anthem, the IDREs, and the Departments that items or services were eligible for IDR resolution, the Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, also represented that the services in dispute were of a particular standard, quality, or grade (*i.e.*, that they were within the scope of the NSA and qualified for IDR) when, in fact, the services were not (*i.e.*, they were ineligible for IDR, despite Defendants' false attestations to the contrary in the IDR initiation notices), in violation of OHIO REV. CODE § 4165.02(A)(9).

243. Defendants' acts have caused substantial economic harm to Anthem, its employer plan sponsor customers, and other BlueCard plans.

244. Anthem is entitled to actual damages, an order enjoining these practices in violation of the statute, and its costs and attorney's fees in connection with bringing this action.

## COUNT VII
## FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

245. Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

246. For each of the IDRs initiated, Defendants submitted a completed version of the mandatory IDR notice of initiation to Anthem, the IDREs, and the Departments, which, in part, contained the following attestation:

> I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge…the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

247.   Yet, as discussed herein, thousands of Defendants' attestations were false, as the underlying services or disputes were not qualified items or services, and in fact, were ineligible for resolution through the NSA's IDR process.

248.   The Provider Defendants, or the HaloMD Defendants on behalf of the Provider Defendants, submitted the IDR notice of initiation in each dispute with full knowledge of, or at the very least with utter recklessness as to, the falsity of this attestation. From the patient's insurance cards, Anthem's EOPs, the plain text of federal laws and regulations, CMS publications and resources, the Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that Anthem submitted to the Provider Defendants and to the HaloMD Defendants, among other sources, Defendants knew that the services and disputes they were initiating were ineligible for the IDR process.

249.   The Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, nevertheless submitted these false attestations and did so with the intent that Anthem and the IDRE rely on them. According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). Even if Anthem contested eligibility, Defendants' deliberate misrepresentation forced Anthem to reasonably and foreseeably rely on the misrepresentation because once the IDRE determines the dispute is eligible, Anthem has no choice but to proceed with the process, submit a final offer, and allow the dispute the continue to a payment determination; any other approach

would result in a default award against Anthem in favor of Defendants for whatever outrageous amount Defendants included in their final offer.

250.    As described above, these misrepresentations were submitted by corporate agents using corporate email addresses—including nsa@halomd.com, nsatexas@halomd.com, and medsurantarbitrationnsa@halomd.com—which, upon information and belief, was an attempt to conceal the identity of the individuals submitting the false attestations. As parties to IDR have no ability to engage in discovery—in fact, the parties submit final offers and supporting evidence in a blind process without the right or ability to see the other party's submission—the submission of false attestations achieved the concealment of the corporate actors filing the false attestations.

251.    Between January 4, 2024 and April 30, 2025, the Provider Defendants, and HaloMD on behalf of the Provider Defendants, submitted thousands of false attestations, including, for example, the disputes specifically referenced above.

252.    These false attestations of eligibility pertain to material facts in the IDR process because they go to the heart of the IDRE's jurisdiction to even hear the dispute.

253.    The Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, submitted the false attestations to receive a windfall for themselves, namely, IDR payment determinations in favor of Defendants and against Anthem regarding items or services that were ineligible for resolution through the IDR process.

254.    At all times when submitting the false attestations and engaging in the relevant IDR disputes, the HaloMD Defendants were acting within the scope of HaloMD's agreements with the Provider Defendants to handle the IDR process for the Provider Defendants in connection with the identified disputes.

255.    The Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, also fraudulently misrepresented to Anthem during the statutorily required open negotiations process that the disputes were eligible for IDR and involved qualified IDR items and services meeting the NSA and regulatory definitions of that term.

256.    Anthem reasonably, foreseeably, and justifiably relied on Defendants' misrepresentations during the open negotiations and IDR initiation process. As part of the fraudulent scheme described herein, Defendants' tactic to strategically flood the IDR process and overwhelm the system precluded Anthem from investigating each and every aspect of the tens of thousands of disputes they submitted within the 30-day open negotiations window or within three days of IDR initiation. Additionally, in some cases (such as when the patient waived balance billing protections), Defendants are the only entities in possession of information critical to Anthem's ability to assess a claim for IDR eligibility, such as information pertaining to the provider, types of services rendered, and patient records. As a result, Anthem justifiably relied on Defendants' misrepresentations that the disputes were eligible for IDR and incurred significant monetary losses through incurring fees required by the NSA and in the form of IDR payment determinations finding against Anthem.

257.    Even after discovery of the falsity of their attestations, Defendants failed to notify either Anthem or the IDRE, and, instead, concealed their falsity despite being under a duty to disclose such information. According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). Defendants concealed the falsity of their attestations to further their scheme to defraud Anthem and abuse the IDR process.

258.    As a direct and proximate result of these misrepresentations by Defendants, Anthem has suffered substantial damages in the form of payment on IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

### COUNT VIII
### VACATUR OF NSA ARBITRATION AWARDS
### (Against All Defendants)

259.    Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

260.    Defendants improperly obtained arbitration awards under the NSA by misrepresenting that the services were qualified IDR items or services, warranting vacatur of such awards under 9 U.S.C. § 10(a) and 42 U.S.C. § 300gg-111(c)(5)(E).

261.    The IDR payment determinations at issue were procured by undue means and misrepresentation.

262.    For the IDR payment determinations at issue, the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process.

263.    Defendants continue to obtain awards by undue means and misrepresentation. Thus, the list of IDR payment determinations subject to vacatur is expected to increase during the pendency of the case.

### COUNT IX
### ERISA CLAIM FOR EQUITABLE RELIEF
### (Against All Defendants)

264.    Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

265.    Anthem provides claims administration services for certain health benefit plans governed by ERISA. Those health benefit plans and their employer sponsors delegate to Anthem

discretionary authority to recover overpayments, including those resulting from fraud, waste, or abuse.

266.    ERISA authorizes a fiduciary of a health plan to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

267.    Section 1185e of ERISA sets out the rights and obligations of plans and medical providers with respect to the IDR process, including that the IDR process does not apply in situations where there is a specified state law, where the provider is a participating provider, and where the provider has not initiated or engaged in open negotiations. 29 U.S.C. § 1185e.

268.    Through the acts described herein, Defendants have caused and continue to cause the overpayment of funds on behalf of ERISA-governed benefit plans through conduct that violates Section 1185e of ERISA.

269.    Defendants are continuing to engage in such improper conduct, including but not limited to failing to properly initiate or engage in open negotiations prior to initiating the IDR process, initiating IDR for services subject to Ohio's specified state law, initiating IDR with respect to claims that Anthem denied and thus are exempt from the IDR process, and failing to comply with other NSA requirements such as the IDR batching rules or the cooling off period. This conduct causes ongoing harm to Anthem and the ERISA-governed benefit plans.

270.    There is an actual case and controversy between Anthem and Defendants relating to the claims fraudulently submitted and arbitrated as part of the NSA's IDR process.

271.    Anthem seeks an order enjoining Defendants from:

  a.  Initiating IDR without first properly initiating and engaging in open negotiations;

b. Initiating IDR for services subject to Ohio's specified state law;

c. Initiating IDR for services that Anthem denied and thus are not eligible for IDR; and

d. Initiating IDR for services when Defendants failed to comply with other NSA requirements such as the deadline to initiate IDR following open negotiations.

## COUNT X
## DECLARATORY AND INJUNCTIVE RELIEF
### (Against All Defendants)

272. Anthem repeats and realleges the allegations in Paragraphs 1 through 179 contained in this Complaint as if fully set forth at length herein.

273. Anthem seeks a declaration that Defendants' conduct in submitting false attestations and initiating IDR for unqualified IDR items or services is unlawful. Anthem additionally seeks a declaration that IDR awards for such unqualified IDR items or services are not binding. It further seeks an injunction prohibiting Defendants from continuing to submit false attestations and initiate IDR for items or services that are not qualified for IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for IDR.

274. With respect to health plans and claims governed by ERISA, this cause of action is alleged in the alternative to the previous cause of action, in the event that the Court determines that relief under Section 1132(a)(3) of ERISA is not available.

275. There is no adequate remedy at law to prevent the ongoing harm caused by Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, Anthem respectfully requests that the Court:

a. Vacate all improperly obtained NSA arbitration awards;

b. Enter an injunction prohibiting Defendants from submitting unqualified IDR items and services to IDR and otherwise initiating improper arbitrations;

c. Award compensatory, punitive, and treble damages;

d.  Order the return of funds wrongfully obtained by Defendants;

e.  Award costs, attorney's fees, and interest;

f.  Declare that IDR awards issued on unqualified IDR items or services are non-binding and are not payable on a go-forward basis;

g.  Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Anthem demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Ariel M. Fox*
Ali Razzaghi (0080927)
Ariel M. Fox (0100904)
Richard J. Sarcone (0100775)
**Frost Brown Todd LLP**
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Tel: (513) 651-6800
arazzaghi@fbtlaw.com
afox@fbtlaw.com
rsarcone@fbtlaw.com

Martin J. Bishop (*pro hac vice* forthcoming)
Illinois Bar No. 6269425
Alexandra M. Lucas (*pro hac vice* forthcoming)
Illinois Bar No. 6313385
Jason T. Mayer (*pro hac vice* forthcoming)
Illinois Bar No. 6309633
**Reed Smith LLP**
10 S. Wacker Dr. Suite 4000
Chicago, IL 60606
Tel: 312.207.1000
mbishop@reedsmith.com
alucas@reedsmith.com
jmayer@reedsmith.com

Zachary B. Kizitaff (*pro hac vice* forthcoming)
Pennsylvania Bar No. 327568
**Reed Smith LLP**
Three Logan Square
1717 Arch St. Suite 3100
Philadelphia, PA 19103
Tel: 215.851.8100
zkizitaff@reedsmith.com

*Attorneys for Plaintiff Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio*